**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Crim. No. 21-CR-743 (FYP)** |
| **v.** | : | |
| | : | |
| **THOMAS PAUL CONOVER,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Thomas Paul Conover to a split sentence of a thirty-day term of incarceration followed by a three-year term of probation, sixty hours of community service, and $500 restitution.

## I.    INTRODUCTION

The defendant, Thomas Paul Conover—who is self-employed and the co-owner of an auto dent removal company—and his friend Kevin Sam Blakely (Crim. No. 21-CR-356 (EGS)),[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' property damage.

Conover pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a split sentence of a

---

[1] On October 21, 2021, Blakely plead guilty to Count Four of the Information filed against him in his case, specifically 40 U.S.C. § 5104(e)(2)(G). On March 7, 2022, Judge Sullivan reset Blakely's sentencing to May 4, 2022. *See* Crim No. 21-CR-356 (EGS), ECF Minute Order dated Mar. 7, 2022.

thirty-day term of incarceration followed by a three-year term of probation is appropriate in this case because: (1) Conover encouraged others to "join the mob" and warned that a "shit storm is coming;" (2) Conover pushed through violent rioters and an overwhelmed police line at the East Rotunda door to gain access to the Capitol; (3) while in the Great Rotunda of the Capitol, Conover stated that he was "proud of the people" who were there with him and that he was "glad [he] came;" (4) Conover joined in a failed effort of rioters to push their way through law enforcement officers that were preventing rioters from penetrating deeper into the Capitol through the west door of the Great Rotunda; (5) while law enforcement officers attempted to push Conover and other rioters out of the Great Rotunda, Conover stood his ground and did not immediately comply with commands to leave the building; and (5) after leaving the Capitol, Conover continued to make light of the violent events of the day by stating, "I don't always storm the Capitol of the United States of America, but when I do, I prefer Coors Light."

To the government's knowledge, Conover didn't personally or directly engage in targeted violence against law enforcement—though he came close—or property destruction during the riot. While Conover's apparent non-participation in felony-level crimes is a good thing, it should not be seen by this Court as a mitigating factor. Before entering the Capitol on January 6, Conover took to social media to announce his trip to Washington, D.C., and encouraged others to do the same. While on restricted grounds, he posed for pictures smiling broadly behind a partially torn-down fence with the words AREA CLOSED in large red block letters. When he was inside, he posted on social media, "We took the Capital [sic]." After leaving, instead of recognizing the violence of the day for what it was, he filmed several takes of a selfie-style beer commercial. He did not make a quick exit out of the Capitol, he remained inside for over twenty minutes. When he saw his distinctive sweater on various news reports, he appears to have taken screenshots and

shared those with others, behavior that could lead a reasonable person to conclude that he was proud of being easily identified among the other rioters and proud of his involvement in the events of that day.

Unlike some other defendants who engaged in similar or more serious conduct on January 6, 2021, Conover appears to have stayed out of trouble after January 6 and has refrained from publicly celebrating the violence and chaos of that day. The written statement as contained in Conover's Presentence Investigation Report appears to be sincere. He wrote, in part, "Biden won the election PERIOD! [ . . . ] I was involved in something I abhor. I want to apologize to the capital police, the National Guard, all law enforcement, the residents of D.C. and the Court. This is not who I am and I am truly sorry for my actions." ECF No. 21, p. 6.

The Court should consider that the defendant's conduct on January 6, like the conduct of many other defendants, took place in the context of a violent riot that—to the extent that it did succeed—did so relying on its numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. The defendant was a part of the group that violently entered through the East Rotunda door of the Capitol and resisted the efforts of law enforcement to force Conover and others out. Conover's planning for and participation in the Capitol siege, along with his simultaneous celebration of the momentary successes of the mob, renders a split sentence of a thirty-day term of incarceration followed by a three-year term of probation both necessary and appropriate in this case.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### *The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol that the parties agreed to as part of the Statement of Offense. ECF No. 19, ¶¶ 1-7. But it is important to note that each participant in a riot is still part of that riot. As Judge Chutkan

recognized, "A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers." *United States v. Matthew Mazzocco*, 21-CR-54 (TSC), ECF No. 32, p. 25. Judge Lamberth similarly wrote,

> Some of the rioters—now defendants in criminal cases—directly contributed to this violence by assaulting members of law enforcement or by planning, preparing, and facilitating this violence. Others, like Little here, did not directly assault officers. But even Little and those who engaged in this "lesser" criminal conduct were an essential component to the harm. Law-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, p. 2. From the most mundane actions to the most violent, each rioter contributed directly and indirectly to the violence and destruction of that day, including Thomas Paul Conover.

*Thomas Paul Conover's Role in the January 6, 2021, Attack on the Capitol*

As early as December 2020, Conover was communicating with his friend and fellow rioter Blakely to coordinate plans to go to Washington, D.C., and "join the mob." ECF No. 1-1, p. 3. On the eve of the sixth, Conover predicted that a "shit storm is coming." *Id.* On January 6, Conover happily snapped photos of himself on restricted grounds and took selfies with overwhelmed law enforcement in the background. As shown in the photos below, Conover posed for a picture on Capitol grounds while standing behind a green fence that has a sign attached which read: AREA CLOSED – BY ORDER OF THE UNITED STATES CAPITOL POLICE BOARD. Conover also posed for a selfie while a USCP officer stood at the East Rotunda Door of the Capitol attempting to keep folks out.

 

*IMAGE 1* and *IMAGE 2* (l to r)—Conover posing for a picture on Capitol grounds while standing behind a green fence that has a sign attached which reads: AREA CLOSED – BY ORDER OF THE UNITED STATES CAPITOL POLICE BOARD; and Conover posing for a selfie while a USCP officer stands at the East Rotunda Door of the Capitol.

At approximately 2:13 PM, By 2:56 PM, Conover had made his way through the burgeoning crowd on the east front of the Capitol. After January 6, Conover claimed that "the [Capitol] was not stormed" and that "the people walked in" (ECF No. 1-1, p. 3), surveillance images from that day show that the Capitol *was* stormed and that the way most rioters gained entry was through chaotic and violent throngs.



01/06/2021 18:59:20



0933 USCG 00 CVC Elevator Tower North
01/06/2021 19:06:09

*IMAGE 3* and *IMAGE 4* (top to bottom)—*The rioters on the East Plaza of the Capitol first breached the barricades at approximately 1:59 PM. (NOTE: Time shown on screenshot is Coordinated Universal Time (UTC).) The rioters overwhelmed a line of law enforcement at the base of the Central East Steps and pushed them back to the East Rotunda Doors at approximately 2:06 PM.*



01/06/2021 19:13:01



01/06/2021 19:25:03

*IMAGE 5 and IMAGE 6 (top to bottom)—Meanwhile on the west front, the first rioter to breach the Capitol did so by breaking out a window next to a first floor door leading from the Northwest Plaza of the Capitol to a north-south running hallway that connects the Brumidi Corridors with the Crypt—this door is commonly referred to as the Senate Wing Door—at approximately 2:13 PM. The rioters made their way to the second floor and pushed open the East Rotunda Doors at approximately 2:25 PM. See also a Slate reporter's twenty-two-second video taken at approximately the same time providing chilling sound during the rioters attempt to forcibly breach the Rotunda doors, found at https://twitter.com/jim_newell/status/1346899789347233796.*



01/06/2021 19:25:37



01/06/2021 19:53:13

**IMAGE 7** and **IMAGE 8** (top to bottom)—By the time the East Rotunda Doors were breached, hundreds had gathered on the East Plaza and swarmed the Central East Steps. At approximately 2:53 PM, many rioters were being forced out of the Capitol. Conover, however, going against the stream made his way to the entrance. Image 8 appears to capture the moment when Conover decided to take a selfie (see Image 2). At the moment Conover took the picture, the officer in the background was attempting to allow those inside to leave while keeping those outside out.





*IMAGE 9* and *IMAGE 10* (top to bottom)—Surveillance shows Conover surging forward with the crowd and entering the Capitol through the East Rotunda Door at approximately 2:56 PM. Exterior surveillance shows how the number of rioters on the east front continued to grow.

Once inside, Conover took several photographs of himself with an empty beer can. It was also during his time in the Rotunda that Conover filmed a video and gave his stream-of-consciousness thoughts about what was happening. Conover stated in sum and substance:

THIS IS IT, BOYS AND GIRLS. THIS IS THE CAPITOL. APPARENTLY, THERE'S SOME CRAZY SHIT GOING ON IN THE SENATE TODAY AND THE CERTIFICATION. THEY'VE HAD ENOUGH. WELL, UH, HERE WE ARE! HA HA HA HA!

I PRAY TO GOD THAT NOBODY DOES ANY DAMAGE TO THE STUFF IN HERE, 'CAUSE I'M NOT DOWN WITH THAT. BUT I'M KIND OF, KIND OF PROUD OF THE PEOPLE THAT STOOD UP AND SAID YOU KNOW WHAT? ENOUGH. YOU DON'T SEE PEOPLE SPRAY PAINTING SHIT OR BURNING SHIT DOWN. IT'S REALLY KIND OF COOL. I'M GLAD I CAME.

 

*IMAGE 11* and *IMAGE 12* *(left to right)—Surveillance shows Conover recording video on his cellphone while in the Great Rotunda; and video recovered from Conover's phone shows the same moment in time from his point of view.*



*IMAGE 13—Surveillance with a photo recovered from Conover's phone (with a red box boundary) shows Conover posing with an empty beer can in front of John Trumbull's 1826 painting General George Washington Resigning His Commission. (see https://www.aoc.gov/explore-capitol-campus/art/general-george-washington-resigning-his-commission).*

Conover's behavior took a dark turn when law enforcement tried to regain control over the breached Capitol. He joins a crowd in the Great Rotunda that is chanting: PUSH! PUSH! PUSH! as they attempt to overwhelm a line of law enforcement blocking the west exit from the Great Rotunda. Members of the crowd can additionally be heard yelling: YOU CAN'T STOP US ALL! and THERE'S MILLIONS OF PEOPLE OUTSIDE! YOU BETTER MOVE!



*IMAGE 14—A screenshot from a video obtained from French News Media Company Bangumi that shows Conover joining in an effort by rioters to push through a line of law enforcement blocking the west exit from the Great Rotunda.*

The rioters—including Conover—failed in their attempt to breach law enforcement on the west side of the Great Rotunda. Metropolitan Police Department officers arrived and made efforts to sweep out of the Great Rotunda and the Capitol all those—including Conover—who refused to leave of their own accord. While Conover is never seen instigating violence against law enforcement, he refrains from doing anything that could constitute complying with their orders to get leave. He can be seen at various times pushing his phone in their face and pointing his finger at them.



***IMAGE 15***—*Surveillance shows law enforcement pushing the rioters back towards the East Rotunda door. Conover can be seen facing law enforcement—not the exit—and recording video on his cellphone.*



*IMAGE 16—Surveillance shows law enforcement pushing the rioters back towards the East Rotunda door. Conover can be seen facing law enforcement—not the exit—and pointing his finger at them.*



*IMAGE 17—Conover finally left the Capitol through the East Rotunda door at approximately 3:18 PM.*

After leaving the Capitol, Conover continued taking selfies and posing for photos with his empty beer can. While filming one such video, Conover stated in sum and substance: I DON'T ALWAYS STORM THE CAPITOL OF THE UNITED STATES OF AMERICA. BUT WHEN I DO, I PREFER COORS LIGHT.



*IMAGE 18— A screenshot from one of two selfie-style videos that Conover filmed of himself. In both videos, Conover stated in sum and substance: I DON'T ALWAYS STORM THE CAPITOL OF THE UNITED STATES OF AMERICA. BUT WHEN I DO, I PREFER COORS LIGHT. There is no indication that Conover drank from the can while inside the Capitol.*

Soon after participating in the Capitol siege, Conover shared images of himself inside the Capitol with others, bragging about how he "had a beer in the [Capitol] today."



*IMAGE 19—A screenshot of a conversation on social media between a tripster and Conover in which the tipster tells Conover to "Behave..I don't want to spend my $2000 to get you out of jail. Conover later responded by boasting that he "had a beer in the [Capitol] today." See **Image 13**.*

In total, Conover spent approximately twenty-two minutes inside the Capitol. Conover admitted that he knew at the time he entered the Capitol that he did not have permission to do so, and while inside he paraded, demonstrated, or picketed.

*Paul Thomas Conover's Remorse*

At the time of his arrest, as is his right, Conover declined to speak with law enforcement without an attorney present. He did, as previously indicated, write what appears to be a genuine letter that was included in the Presentence Investigation Report. ECF No. 21, p. 6. To the

government's knowledge, Conover has not attempted to publicly defend his actions or the actions of others who were part of the Capitol siege on January 6, 2021.

## III.    THE CHARGES AND PLEA AGREEMENT

On December 3, 2021, Thomas Paul Conover was charged via a Criminal Complaint with violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 8, 2021, he was arrested at his home in Texas. On December 23, 2021, Thomas Paul Conover was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 7, 2022, Thomas Paul Conover pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol building. By plea agreement, Thomas Paul Conover agreed to pay $500 in restitution to the Department of the Treasury.

## IV.    STATUTORY PENALTIES

Thomas Paul Conover now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces a term of imprisonment up to six months and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this misdemeanor case, 18 U.S.C. § 3553(a) informs the factors the Court must consider in crafting a sentence that is sufficient, but not greater than necessary to achieve the goals under that same section. This section identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the

seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the § 3553(a) factors weigh in favor of a split sentence of a thirty-day term of incarceration followed by a three-year term of probation.

## VI.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The siege of the Capitol on January 6, 2021, is an unparalleled criminal offense in American history. It represented a grave threat to our democratic norms. It was the one of the only times in our history when the building was occupied by rioters who were hostile to American democratic norms and processes.

Each defendant should be sentenced based on their individual conduct. As we now discuss, however, this Court should note that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they would have— at a minimum—crossed through numerous barricades and stepped or climbed over numerous barriers. This was certainly true for Conover who took the time to memorialize with a photograph himself standing behind a barrier with an AREA CLOSED sign. Conover again, on the threshold of the Capitol, stopped and took another photograph just before crossing another barrier, this time being a USCP Officer who was attempting to keep unauthorized persons, including Conover, out of the Capitol.

They would have heard the cries and throes of a mob. Depending on the timing and location of their approach, they may have also observed fighting with law enforcement officials and smelled chemical irritants in the air or felt the effects of the same in their eyes. No rioter was a mere tourist that day. Again, this is especially true for Conover who

While looking at each defendant's individual conduct, the government recommends that the Court assess such conduct on a spectrum. This Court, in determining a fair and just sentence should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.

Thomas Paul Conover wanted to join his friend Blakely in taking their country back. Conover committed to going to Washington, D.C., encouraged others to join the mob, and prognosticated that a "shit storm" was coming. Unlike others, Conover did not appear to desire or prepare for violence, but he did bring a prop with him, specifically his empty can of beer.

True to his intent, Conover did cross onto restricted grounds (stopping for a picture), made his way to the Capitol, and pushed his way through the crowd and eventually into the Capitol itself. He quickly went into the Rotunda and used the prop he brought with him to take photos in front of paintings.

To get to the up the East Central staircase when he did, Conover would have had to push and maneuver his way through an increasingly agitated crowd. To make his way through the door, he would have had to push past law enforcement and through other rioters that were trying to leave. Soon after he got to the Rotunda, Conover tried to help a failed attempt to breach law enforcement on the Rotunda's west door. He resisted as law enforcement tried to force him and others out. And even after being forced out, he did not leave. Instead, he took the time to pull out his prop and appropriate the Dos Equis beer slogan into a parody beer commercial that conflated storming the Capitol and Coors Light.

Conover did quickly accept responsibility, however a defendant's expression of remorse can be an unreliable watermark in January 6 cases. For example, District Court Judge Tanya S. Chutkan spoke about remorse as follows:

> And I take into account the government's statement and [defense counsel]'s statement that he accepted early responsibility. But [the defendant's] remorse—and I believe his remorse is sincere—[the defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.

*United States v. Matthew Carl Mazzocco*, 21-CR-54 (TSC), ECF No. 32, pp. 29-30. Judge Lamberth also addressed the topic of remorse in a Memorandum Opinion authorizing the imposition of a split sentence as to Class B misdemeanor convictions.

> The Court often finds it difficult to ascertain the sincerity of these particular defendants' remorse. Many defendants appear sincere at sentencing, boasting of their purportedly deep shame, regret, and desire to change and be law-abiding citizens. But this Court is all too familiar with crocodile tears. Indeed, one day after being sentenced to probation, another January 6 defendant made statements in an interview that directly conflicted with the contrite statements that she made to the undersigned.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, pp. 3-4.

Accordingly, the nature and the circumstances of this offense render the government's proposed sentence sufficient but not greater than necessary to reflect the seriousness of the instant

offense, to promote deterrence, to protect the public from future crimes that may be committed by the defendant, and to avoid unwarranted disparity.

## VII.   THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

As set forth in the PSR, Thomas Paul Conover has no criminal history and one traffic infraction from eight years ago. He does not appear to have any other arrests. As of the writing of this memorandum, Conover has been compliant with his conditions of pre-trial release. His wife, in a statement to Probation, stated that Conover "is not fanatical in his political beliefs" and that Conover does not have "a subversive bone in his body." ECF No. 21, p. 8. Be that as it may, once Conover was in Washington, D.C., he did become an active participant in the siege of the Capitol, making his way through the crowd and through the East Rotunda door, participating in an attempted breach of law enforcement in the Rotunda, standing his ground against officers attempting to clear the Rotunda, and then—after seeing the violence, the disruption, and the destruction—remaining on restricted grounds and recording a parody commercial about drinking beer while storming the Capitol.

With these considerations in mind, it does not appear that specific deterrence in the form of incarceration is necessary, but a split sentence of a thirty-day term of incarceration followed by a three-year term of probation with the specific conditions recommended by the government would serve to specifically deter Conover from engaging in similar violations of law in the future.

## VIII.   THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE AND PROMOTE RESPECT FOR THE LAW

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic

process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of a split sentence of a thirty-day term of incarceration followed by a three-year term of probation and should not be probation only. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

## IX.   THE NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant]

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov /files/Wray%20Testimony.pdf

and others caused that day goes way beyond the several-hour delay in the certification. It
is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v.*

*Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a

manner that delays the certification of the election, throws our entire system of government into

disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.")

(statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States*

*v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment

rights.") (statement of Judge Moss). It is important to convey to future potential rioters—especially

those who intend to improperly influence the democratic process—that their actions will have

consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As discussed above, Conover's behavior, videos, his post-January 6 compliance with

Pretrial, and both his broken leg and cancer diagnosis temper the need for specific deterrence for

this defendant.

Conover did not, however, turn back when he saw the downed fence and barricades. He

went forward. He did not turn back when making his way through the increasingly whipped-up

crowd on the east front. He went forward. He assisted rioters in the Rotunda who were attempting

to break through a line of law enforcement, and he did not immediately comply with law enforcement when they told him to leave. He justified his actions by making an inapt comparison to other riots, stating, "YOU DON'T SEE PEOPLE SPRAY PAINTING SHIT OR BURNING SHIT DOWN. IT'S REALLY KIND OF COOL. I'M GLAD I CAME." As Judge Chutkan stated:

> What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.

*U.S. v. Mazzocco*, ECF No. 32, p. 24. Conover was at times both a passive and active participant in that mob, and specific deterrence is necessary. The government believes that its recommended sentence will achieve the Court's and our federal government's established sentencing goals.

## X.    THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assaults on law enforcement, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not necessarily become the default.[4] Indeed, the government invites the Court to join Judge

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United*

Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with fewer days incarceration or home detention.

Thomas Paul Conover has pleaded guilty to Count Four of the Information, charging him with willfully and knowingly parading, demonstrating, or picketing in any of the Capitol Buildings, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

*States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of any statements they made (on social media or otherwise), whether they destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence Judge Walton imposed on Jeffery Alexander Smith (21-CR-290 (RBW)), specifically a split sentence of a ninety-day term of incarceration followed by a twenty-four-month term of probation. Smith entered the Capitol through the Upper West Terrace Door but made his way to the Rotunda and assisted in what was the second breach of the East Rotunda Doors. *See United States v. Jeffrey Alexander Smith*, 21-CR-290 (RBW), ECF Nos. 36, 42, 44. Like Conover, Smith only left the Capitol when physically forced out of the Rotunda by law enforcement. The fact that Smith played an active role in the breach of the East Rotunda Doors is an aggravating factor that Conover lacks, but Conover, like Smith, stood his ground against law enforcement. Just as the imposition of a split sentence was appropriate in the case of Smith, so to is it in this case.

In the case of Michael Joseph Rusyn (21-CR-303 (ABJ)), the government recommended a sentence of forty-five days incarceration. Rusyn also entered through the chaos at the East Rotunda

Door, but Rusyn made his way south towards the House Chamber. Like Conover, Rusyn was part of the attempt to breach a line of law enforcement, but in Rusyn's case, the rioters succeeded in getting past law enforcement attempting to keep them out of the House Corridors. Rusyn left the Capitol at about the same time that Conover was pushing his way in. *See United States v. Michael Joseph Rusyn*, 21-CR-303 (ABJ), ECF Nos. 49, 50, 62. The Court sentenced the defendant there to a twenty-four month term of probation with the condition of a two-month term of home detention.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## XI.    THE COURT'S LAWFUL AUTHORITY TO IMPOSE A SPLIT SENTENCE

The sentence requested by the government—sixty days of incarceration followed by thirty-six months' of probation—is a lawful one. A sentencing court may impose a "split sentence," meaning "a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for a

defendant convicted of any federal offense, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### a.  *A sentence imposed for a petty offense may include both incarceration and probation.*

#### i.   Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[5] followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[6]

---

[5] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

[6] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

ii.   Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary

purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of

a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section

3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons. First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 23 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia &

Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 23, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty

offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Conover pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**b. *A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.***

i. <u>Relevant Background</u>

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation, a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[7]

  ii. <u>Analysis</u>

   A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent

---

[7] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[8]  That would be an appropriate sentence in this case.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improved, or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In this case, the government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

### c. *Recent Findings and Sentences by D.D.C. Judges Support the Government's Contention that a Split Sentence is Authorized*

Together with this sentencing memorandum, the government is filing a Memorandum Opinion by District Judge Royce C. Lamberth from March 14, 2022 (*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43) which squarely addresses the question of a split sentence, defined as "a period of incarceration followed by a period of probation." *Foster v. Wainwright*, 820 F. Supp. 2d 36, 39 n. 2 (D.D.C. 2011). The opinion "elaborates on the Court's reasoning as to why a split sentence is permissible under law and warranted by the circumstances of this case." *Id*. The

---

[8] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

opinion supports the argument in the government's sentencing memorandum (ECF No. 25, pp. 33-42) that this Court has the authority to impose a split sentence. Indeed, that same day, the government filed Judge Lamberth's opinion as a supplemental authority in *United States v. Jeffrey Alexander Smith*, 21-CR-290 (RBW)[9], and the next day in *Smith*, Judge Reggie B. Walton also imposed a split sentence. More recently, on March 24, 2022, during the sentencing in the case of *United States v. Micajah Joel Jackson*, 21-CR-484 (RDM), Judge Randolph D. Moss found that while he agrees with Judge Lamberth that the relevant statutes allow for a split sentence on petty offenses, he did not impose one in that case given fact-specific findings. Instead, Judge Moss opted for imposing ninety days in a Residential Reentry Center as a condition of a three-year term of probation.[10]

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

---

[9] *See* ECF No. 43.

[10] *See* MINUTE ENTRY, March 24, 2022. The government is awaiting the transcript from that hearing and will update the Court with Judge Moss' specific language should it receive the transcript before the sentencing in this case.

## XII.   CONCLUSION

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Thomas Paul Conover to a split sentence of a thirty-day term of incarceration followed by a three-year term of probation, sixty hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty because of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
D.C. BAR NO. 481052
ACTING UNITED STATES ATTORNEY

By:   Sean P. Murphy
D.C. Bar No. 1187821
Assistant United States Attorney
U.S. Attorney's Office—District of Puerto Rico
Torre Chardon, Ste 1201
350 Carlos Chardon Avenue
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov